[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11778

Non-Argument Calendar

_____

ZHONGWEI LIU,
a.k.a. Tomm Hall Ingod,
ZELI WANG,
a.k.a. Ivy E. Ingod,

                                                            Petitioners,

*versus*

U.S. ATTORNEY GENERAL,

                                                            Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A206-060-691

_____

Before LAGOA, BRASHER, and TJOFLAT, Circuit Judges.

PER CURIAM:

Pro se petitioners Tomm Hall Ingod and Ivy E. Ingod seek review of the Board of Immigration Appeals's (BIA) final removal order.[1] The BIA affirmed the Immigration Judge's (IJ) denial of the Ingods' application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). The Ingods seek review for two reasons. First, they argue that the BIA erroneously affirmed the IJ's decision because the IJ violated their due process rights. Second, they assert that the BIA erroneously affirmed the IJ's finding that the Ingods failed to establish that they are eligible for asylum, withholding of removal, and CAT relief. For the reasons below, the Ingods' petition is denied.

## I. Background

Around August 27, 2012, Mr. Ingod was admitted into the United States with a transit visa and was allowed to remain until

---

[1] The BIA accepted the petitioners' assertion that their names have been legally changed. We therefore refer to the lead petitioner as Mr. Ingod, the co-petitioner, and derivative beneficiary, as Mrs. Ingod, and the petitioners collectively, as the Ingods.

September 25, 2012.  Mrs. Ingod was also admitted into the United States as a nonimmigrant visitor.  She was allowed to remain in the United States until February 26, 2013.  Both stayed past the permitted time.  The Department of Homeland Security served the Ingods with Notices to Appear and charged them as removable under the Immigration and Nationality Act (INA) § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B).[2]

### A.  Asylum, Withholding of Removal, and CAT Applications

On August 19, 2013, Mr. Ingod filed a pro se application for asylum, withholding of removal, and CAT relief.  He stated that he was born in Mongolia and was a Chinese citizen.  He also stated that Mrs. Ingod was born in India and was solely a Chinese citizen.

Mr. Ingod asserted that he was seeking asylum and withholding of removal based on his nationality and political opinions, as well as CAT relief.  According to his application, Mr. Ingod's sister went missing during the 1989 Tiananmen Square Massacre.  He explained that his family decided to produce a film in memory of his sister and the Tiananmen Square Massacre.  As a result, he claimed that the Chinese police—prompted by the Li Peng Political Establishment (LPPE)[3]—attempted to detain him in January 2012.

---

[2] Under 8 U.S.C. § 1227(a)(1)(B), "[a]ny alien who is present in the United States in violation of [the INA] or any other law of the United States . . . is deportable."

[3] Per Mr. Ingod, the "LPPE is a Chinese political group founded and led by Li Peng, the former Chinese Prime Minister who [was] dubbed the 'Butcher of Beijing' for his role in the Tiananmen Square Massacre."

Mr. Ingod also explained that he feared harm or mistreatment if he returned to China. After the Ingods fled China to Fiji, the Chinese government charged Mr. Ingod with "inciting subversion of state power." And when the Ingods left for America, the Chinese government charged Mr. Ingod with "espionage." If he returned to China, Mr. Ingod explained that he would be arrested on these charges and physically and psychologically tortured in prison. He stated that he would be especially vulnerable in prison because of his political views and because his parents were Japanese—whom the Chinese people have historically hated. Additionally, Mr. Ingod noted that Chinese authorities froze his bank accounts.

### B. IJ Hearings

In 2013, the Ingods first appeared before an IJ in New York. Mr. Ingod confirmed that he was a Mongolian native and a Chinese citizen. He also conceded removability as charged, but he declined to designate a country of removal. Mrs. Ingod confirmed that she was an Indian native and a Chinese citizen, and she conceded removability as charged. Like Mr. Ingod, she too declined to designate a country of removal.

In 2017, after the Ingods moved to Florida, they appeared before a different IJ.[4] When the IJ explained the duty to submit evidence supporting his claim, Mr. Ingod replied that it was "not

---

[4] The case was transferred from New York to Miami on January 30, 2017, in response to the Ingods' motion for a change of venue.

possible to get evidence" of his sister's death or possible detention. The IJ set a merits hearing for July 2018 so the Ingods could testify and provide evidence.

Before the merits hearing, Mr. Ingod submitted a written statement and provided the following new information. After the Ingods fled to Fiji in 2011, based on a perceived threat, someone from China followed them and attempted to poison Mr. Ingod in July 2012. Mr. Ingod also included details about the evidence that the Chinese authorities based the charges against him on, including making the film. He noted that he received a death threat from China in 2014 and that his father would fake Mr. Ingod's death to help him escape the danger. Mr. Ingod also suggested that his father's suicide in 2017 might have been an effort to convince the Chinese authorities of his own death.

At the merits hearing, the IJ told Mr. Ingod that because he was proceeding pro se, she and the Government would ask him questions. The IJ also explained that she would give Mr. Ingod a chance to add anything he felt was important at the end of the hearing. Mr. Ingod confirmed that he understood this. Mr. Ingod's testimony generally covered four categories: (1) his citizenship, (2) his business and activities in China prior to fleeing, (3) his sister's death and the film, and (4) the Chinese government's actions and charges levied against him.

As to his citizenship, Mr. Ingod denied being a Mongolian citizen but confirmed that he was a Chinese citizen. And he confirmed that Mrs. Ingod was an Indian native. As for his business

and activities in China, Mr. Ingod testified that he ran translation and casino services. His casino service helped wealthy Chinese people find casinos, hotels, and dates, and provided them body-guards abroad. When asked if he had proof that he owned these businesses, Mr. Ingod explained that his records were seized by the Chinese authorities in November 2011 in retaliation for the film—which he also had no documentary evidence of.

Mr. Ingod then elaborated that the 2011 seizure happened while he was on a trip in the Philippines. A community member notified Mr. Ingod about the search and told him that his safe was opened. Upon his return, Mr. Ingod discovered that his certificates of deposit were missing. And when he reported the theft to his bank, he was told that his accounts were frozen. He later learned from a client at a different bank that the police froze his account due to his connection with suspected criminal activities.

Mr. Ingod then testified about the period directly after he and Mrs. Ingod fled China. The Ingods first went to Fiji, where they spent 286 days. When asked why he did not go to Mongolia, Mr. Ingod explained that he had no connections there though he admitted his father was vacationing in Mongolia at the time. He also stated that he did not apply for asylum in Mongolia while in Fiji because he planned to return to China. He testified that they did not consider going to India because Mrs. Ingod's family had "given up everything in India," and that, in the eyes of the Chinese government, the part of India that she was from was part of China.

Mr. Ingod also stated that he originally intended to travel through the United States to Canada for business. When the IJ asked why the Ingods did not ultimately go to Canada, Mr. Ingod first said because his customer canceled but then said "because it's too cold." However, when the IJ noted that Mr. Ingod was admitted to the United States with a transit visa in August 2012, Mr. Ingod clarified that he wanted to go to Canada for business, not as a refugee. Later, Mr. Ingod admitted that he used the transit visa to enter and stay in the United States.

As to his sister, Mr. Ingod reiterated that she had gone missing during the Tiananmen Square Massacre, but his family had never received any official paperwork regarding her death. He did not believe that his sister had been arrested. As for the film, Mr. Ingod testified that although he had not started filming, he had a script; however, he did not have a copy because he paid a writer in Beijing to write it. Mr. Ingod explained that he got ahold of the writer through his "best business partner, a billionaire in Qingdao."[5] He also suggested that the writer might be in a labor camp and may have told the authorities about the film. The IJ then asked Mr. Ingod why he would make such a sensitive movie and why he would hire a writer in China, given the risks. Mr. Ingod responded

---

[5] Mr. Ingod declined to disclose the identity of his business partner because the hearing was being recorded and he did not want the Chinese government to uncover his identity. Mr. Ingod later explained that he met his business partner when he was in college and the partner offered to finance Mr. Ingod's patent for a Bluetooth-like device in 1993. He later attempted to help his business partner donate to the Dalai Lama's university in 2006.

that when he decided to make the film, the political situation in China had "changed dramatically" and he hired a Chinese writer as a matter of trust and cost.

Last, Mr. Ingod spoke about the charges against him. He testified that he was officially charged with espionage but did not have any supporting proof. He later stated that he confirmed the charges against him before filing his asylum application. When asked why he was charged with espionage, Mr. Ingod explained that it was because he helped translate documents for a South Korean NGO, One Nation, which supported North Korean refugees in China. Per Mr. Ingod, One Nation operated out of a coffee shop without the Chinese government's knowledge. Mr. Ingod did not have documentation confirming his work for One Nation, yet he later testified that he had files on his computer. He added that the Chinese government knew that he had sensitive information about the North Korean refugees that he had given to the United Nations High Commissioner for Refugees (UNHCR). After twice visiting the UNHCR's office in Thailand, a local police officer called Mr. Ingod to ask about his visits. As a result, Mr. Ingod believed he was put on a watchlist.

During the Government's examination, Mr. Ingod testified that he had not sought documentation from Mongolia about his citizenship. He also repeated that Mrs. Ingod was not an Indian citizen and that she had not sought paperwork to support this assertion. When asked why he did not seek asylum in Japan given

his ethnicity, Mr. Ingod explained that he lacked "direct connections" with Japan.

Mr. Ingod then described, for the first time in the hearing, that he was poisoned in Fiji in the month before he left. He stated that a blood test confirmed that someone had poisoned him, but he had no proof of this. He did not report the attack to the Fijian police because he believed they would report it to the Chinese embassy. He also stated that he did not report the attack in his asylum application because he could not confirm who was responsible at the time.

Mr. Ingod also testified, for the first time, that he had illegally visited Zhao Ziyang—"the leader of China in 1989." At the time, Zhao was under house arrest as a "political prisoner" because of his support "of the student movement" during the Tiananmen Square Massacre. Although Mr. Ingod visited Zhao in 2004, he confirmed that he did not have any problems with the Chinese government until 2011.

Mr. Ingod concluded his testimony by discussing his name change. He explained that he would not have changed his name if he did not face a "serious threat." Mr. Ingod submitted the court order granting him leave to change his name but admitted that he did not publish his name change. The IJ then informed Mr. Ingod that because he had not followed the required procedure, he had not legally changed his name.

Mrs. Ingod then testified to the following. She confirmed much of Mr. Ingod's testimony, including how they fled China and

how the police searched their home. At Mr. Ingod's prompting, she corroborated Mr. Ingod's allegation that he had been poisoned while in Fiji. Also, at her husband's prompting, Mrs. Ingod testified that Mr. Ingod received a death threat from who she assumed was "the Chinese security agency." The Ingods were in the United States when the threat occurred and learned of the threat from Mr. Ingod's father over the phone.

## C. The IJ's Decision

The IJ then issued an oral decision. The IJ first noted that the Ingods had not designated countries of removal. The IJ therefore designated Mongolia for Mr. Ingod and India for Mrs. Ingod, with China as the alternative for both.

After recounting the Ingods' testimony at the hearing, the IJ found that Mr. Ingod's testimony conflicted with his application for asylum to the extent that it added several other activities and situations that were never covered in his initial application. For example, the IJ noted that Mr. Ingod's application did not include information about how he had been poisoned in Fiji and how this caused him to decide to come to the United States. The IJ also explained that Mr. Ingod's testimony about these events was "vague and confusing."

The IJ further found that, although Mr. Ingod claimed to have done things that would have infuriated the Chinese government—including meeting with Zhao while under house arrest in 2004 and meeting with the Dalai Lama in 2006—he also acknowledged that he had the tacit approval of the Chinese government to

travel as he wished between China and other countries, to make money and establish businesses, and to cater to Chinese million-aires and officials outside the country. The IJ determined that Mr. Ingod's "claims that he engaged in what could be seen sedi-tious activity in 2004, 2006, et cetera, but did not have any prob-lems until 2011" was neither persuasive nor credible. Because Mr. Ingod testified that his bank accounts had been frozen because of suspected criminal activities, the IJ concluded that Mr. Ingod failed to meet his burden that he feared persecution on account of a protected ground.

The IJ also found that Mr. Ingod failed to meet his burden under the REAL ID Act,[6] as he failed to establish testimony that was persuasive and specific enough to establish the facts or corrob-orate his claims. The IJ found that Mr. Ingod failed to corroborate or provide any documentation as to: (1) his claims about his con-tact with the Dalai Lama; (2) his claim that he was poisoned; and (3) proof of his businesses, including the ones he operated outside of China. The IJ noted that this proof could have been obtained from outside of China.

As to Mr. Ingod's statement about his father, the IJ noted the discrepancy between Mr. Ingod's written statement, in which he stated that his father's suicide "might have been an effort to

---

[6] As explained in Section III.B, under the REAL ID Act, "[t]he burden of proof is on the applicant to establish that the applicant is a refugee" through credible testimony or other evidence in record. *See* 8 U.S.C. § 1158(b)(1)(B)(i)–(iii); *see also id.* § 1231(b)(3)(C).

convince the Chinese authorities of [Mr. Ingod's] 'accidental death' abroad," and his testimony that his father emailed him indicating to him that that was his intention. The IJ noted that Mr. Ingod did not produce the email, later stated that it was a phone call, and then explained that it was an unsent email draft in his father's account, which he had access to.

The IJ characterized Mr. Ingod's story as "a confusing web of reasons and events that make . . . the story [look] more as fiction than as fact." And the IJ found that Mr. Ingod provided no evidence that he was making the film, or why his father—who was also involved with making the film—was not harmed by the Chinese government. The IJ determined that Mr. Ingod had not shown that anything he feared in China was because of any imputed political opinion, rather than any criminal activity that he may have been involved in or in connection to his businesses.

The IJ concluded that the Ingods were ineligible for asylum and for withholding of removal. As to CAT relief, the IJ found that Mr. Ingod had failed to establish by credible, persuasive, and specific testimony that it was more likely than not that he would be subject to torture "by a public official or with his or her acquiescence." The IJ therefore denied the Ingods' applications and ordered them to be removed.

### D. Appeal to the BIA

In August 2018, the Ingods appealed the IJ's decision to the BIA where Mr. Ingod made multiple arguments.[7] First, Mr. Ingod argued that the IJ erred in designating Mongolia and India as the countries of removal. He asserted that there was no evidence that he and Mrs. Ingod were "subject[s], national[s], or citizen[s]" of Mongolia and India. Mr. Ingod further argued that he was not allowed to address his fear of prosecution in Mongolia or why India was not a suitable county of removal for Mrs. Ingod.

Second, Mr. Ingod argued that the IJ misread the state court order giving the Ingods leave to change their names. He contended that the IJ was mistaken that the name changes were ineffective until newspaper publication because that is not required when a name change is for personal safety reasons. According to Mr. Ingod, the IJ's mistaken belief led to her refusal to believe anything else from him. He added that the IJ repeatedly expressed skepticism and "constantly cut off his attempt to establish testimony," which prevented him "from fairly presenting [his] case in court."

Third, Mr. Ingod claimed that the IJ made self-contradictory statements. Mr. Ingod noted that the IJ acknowledged that he had mentioned in his asylum application how his movie "infuriated the LPPE," but later stated that Mr. Ingod only raised that fact in his

---

[7] Mr. Ingod's brief to the BIA makes more than thirteen arguments (or what he refers to as "chapters"). His arguments have been consolidated for brevity and clarity.

written statement submitted on the date of his hearing. The IJ's contradiction, according to Mr. Ingod, "might render her [d]ecision meaningless."

Fourth, Mr. Ingod argued that the IJ should have disqualified herself from his hearing. He claimed that the IJ "obviously had very little experience in hearing political asylum seekers from Asia," and "frankly had limited knowledge of the Chinese society, politics, and culture," which led to her having difficulty with his case.

Fifth, Mr. Ingod argued that the IJ "lied" in her factual findings. He alleged that the IJ lied in five instances: (1) finding that Mr. Ingod did not provide any details of the death threat against him in China; (2) finding that Mrs. Ingod's testimony about the poisoning was guided by his leading questions, from which the IJ fabricated discrepancies by omitting consistent details from his own testimony; (3) confusing a 2014 phone call from his father about a death threat with a 2017 email draft about his father's suicide; (4) the IJ's knowledge of the Tiananmen Square Massacre; and (5) finding that Mr. Ingod already testified that Zhao had promised to give him a quarter of his assets for making the movie.

Sixth, Mr. Ingod contended that the IJ "falsified" his oral testimony in three instances: (1) when she wrongly stated that he had testified that he had no money; (2) when she stated that he had identified the writer of the script as alerting the Chinese authorities, rather than the LPPE; and (3) when the IJ inaccurately stated that

he had testified that he was convinced that his sister had been arrested.

Seventh, Mr. Ingod argued that the IJ made misleading statements in her decision. He offered four examples: (1) when the IJ stated that he did not have any proof or any information about what had happened to his sister; (2) when the IJ stated that he failed to explain his 2012 poisoning by Chinese officials in his asylum application; (3) when the IJ noted that Mr. Ingod appeared to have been engaged in what could have been seen as seditious activity in 2004 and 2006, and yet had no issues until 2011; and (4) when the IJ concluded that he had provided no explanation for why he could travel in and out of China.

Eighth, Mr. Ingod alleged that the IJ made six clearly erroneous factual determinations. The errors included the IJ's statements that Mr. Ingod: (1) visited Zhao in prison; (2) stayed in Thailand for one day in 2011; (3) had an antiques business; (4) testified that his mother was Indian with Tibetan parents; (5) had been poisoned in China; and (6) had renewed his work permit in Fiji.

Last, Mr. Ingod reiterated that the IJ denied him a full and fair hearing and contended that the IJ requested either nonexistent or unavailable corroborating evidence to prove his lack of evidence to justify her denial of his claim. He suggested that the IJ "overzealously [mined] non-existent inconsistencies and evidence for her adverse credibility finding, which reveal[ed] her intent to attack [his] credibility." And he accused the IJ of insinuating, based on the lack of corroborating evidence of his assorted businesses, that he

got rich in China illegally. Mr. Ingod concluded by accusing the IJ of being under the influence of medication, based on her appearance and temperament at the hearing.

### E. The BIA's Decision

On May 3, 2022, the BIA dismissed the Ingods' appeal. The BIA noted that, for purposes of the appeal, it accepted the Ingods' assertion that they had legally changed their names. It therefore found that the issue did not affect the IJ's burden-of-proof rulings. Then the BIA rejected Mr. Ingod's assertion that the IJ should have disqualified herself from the case. The BIA reasoned that the IJ's comment about "having difficulty" did not suggest that the IJ was unqualified to hear the case. Instead, the IJ's comment was made after she asked a clarifying question about why Mr. Ingod hired a Chinese scriptwriter. The BIA also rejected Mr. Ingod's assertion that the IJ was under the influence because that allegation was "wholly unsupported by the record."

The BIA further rejected the Ingods' assertions that the IJ "lied," "falsified" Mr. Ingod's testimony, "made misleading statements" to deny his application, or lacked neutrality. Instead, the BIA concluded that the IJ acted within her authority and that the Ingods received a full and fair hearing.

The BIA also agreed with the IJ that Mr. Ingod did not satisfy his burden of proof through persuasive testimony. And it noted that the IJ did not make an adverse credibility finding. As to his claim of past persecution, the BIA recounted Mr. Ingod's testimony and found that the record supported the IJ's determination that

Mr. Ingod's testimony was inconsistent with his asylum application. It noted that Mr. Ingod testified that the movie idea was his alone, but his application had stated that his family decided to produce the film. The BIA also explained that Mr. Ingod's application did not describe his secret actions in support of One Nation, his contact with the Dalai Lama, or his claimed poisoning by the Chinese government in Fiji. And the BIA concluded that IJ permissibly found that Mr. Ingod's "ability to travel in and out of China and operate several businesses was inconsistent with his testimony that his political actions subjected him to persecution by the Chinese government." The BIA thus affirmed the IJ's finding that Mr. Ingod's testimony was insufficiently persuasive to meet his burden of proof.

The BIA also found that the IJ appropriately required Mr. Ingod to submit corroborating evidence to meet his burden of proof. It agreed with the IJ that Mr. Ingod failed to provide evidence corroborating: (1) his claimed contact with the Dalai Lama; (2) his poisoning and medical treatment; and (3) his businesses. The BIA declined to disturb the IJ's finding that Mr. Ingod failed to persuasively explain why he could not submit the alleged email from his father about his true intentions to commit suicide. Although the BIA acknowledged Mr. Ingod's argument that it was hard to find evidence between 1989 and 2004, it found that the IJ reasonably concluded those records were reasonably available. The BIA therefore affirmed the IJ's denial of the Ingod's asylum, withholding of removal, and CAT applications.

Finally, the BIA held that the IJ properly designated Mongolia and India as the primary countries of removal, and China as an alternative. The BIA refused to disturb the IJ's finding that the Ingods provided insufficient corroborating evidence to support their claim that they did not derive citizenship by being born in Mongolia and India. The BIA also rejected the Ingods' argument that they were not allowed to explain why Mongolia and India were not suitable countries of removal. It reasoned that the Ingods did not establish prima facie eligibility for asylum relief and withholding of removal with respect to either country. And the BIA noted that it was undisputed that the Ingods were Chinese citizens, thereby making China an appropriate alternative. The Ingods timely petitioned for review.

## II.  Legal Standards

A few standards of review govern this case. "We review constitutional challenges *de novo*." *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1341 (11th Cir. 2003) (per curiam). "We review the BIA's decision as the final judgment, unless the BIA expressly adopted the IJ's decision." *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016) (per curiam). "Where the BIA agrees with the IJ's reasoning, we review the decisions of both the BIA and IJ to the extent of the agreement." *Id.*

We review legal issues de novo, including whether the BIA afforded a petition "reasoned consideration," and we review the BIA's factual findings for substantial evidence. *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1333 (11th Cir. 2019). "Under the substantial

evidence standard, we 'view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision.'" *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1308 (11th Cir. 2013) (per curiam) (quoting *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc)). "We may reverse the BIA's factual findings only when the record compels a reversal." *Id.*; 8 U.S.C. § 1252(b)(4)(B). And we liberally construe pleadings from pro se petitioners. *See Ali*, 931 F.3d at 1331 n.2.

## III. Discussion

The Ingods repeat many of the arguments they made to the BIA. Those arguments fall into two categories: (1) due process violations and (2) a lack of substantial evidence. We address each in turn.

### A. Due Process

The Ingods make several due process arguments related to the proceedings before the IJ and BIA. To begin, they appear to argue that the BIA failed to give reasoned consideration to their due process arguments. As to the merits, they first argue that the IJ violated Mr. Ingod's due process rights because the Ingods were not given notice that they could be removed to Mongolia and India. The Ingods also make generalized due process arguments, including that the IJ: (1) failed to appropriately explain the merits hearing process, (2) did not allow Mr. Ingod to testify in narrative form, and (3) was inappropriately influenced by the assumption that the Ingods fraudulently changed their names.

### i. Reasoned Consideration

We start with the Ingods' reasoned consideration argument. "To enable our review, the [BIA] must 'give "reasoned consideration"' to an applicant's claims and 'make adequate findings.'" *Ali*, 931 F.3d at 1333 (quoting *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006)). Reasoned-consideration examination is a threshold determination on whether the BIA "reached a decision only after having evaluated the entire evidentiary record." *Id.* To do so, the BIA must draft a decision that shows it has "consider[ed] the issues raised and announce[d] its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Tan*, 446 F.3d at 1374 (quoting *Verga-Molina v. INS*, 956 F.2d 682, 685 (7th Cir. 1992)). Although "the agency is required to consider all the evidence that a petitioner has submitted, it 'need not address specifically each claim the petitioner made or each piece of evidence the petitioner presented.'" *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016) (quoting *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 534 (11th Cir. 2013)).

"We have sustained reasoned-consideration claims in three types of circumstances: when the [BIA] 'misstates the contents of the record, fails to adequately explain its rejection of logical conclusions, or provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record.'" *Ali*, 931 F.3d at 1334 (quoting *Jeune*, 810 F.3d at 803). All three instances "flow from some irreconcilable tension between the opinion and the record evidence." *Id.* So although the BIA need

not discuss all the record evidence, sometimes "it is practically impossible for the [BIA] to write a reviewable decision without discussing 'highly relevant' evidence." *Id.*

The Ingods' argument that the BIA did not give reasoned consideration to their due process arguments is belied by the record. The BIA raised, then rejected, the Ingods' contentions about the IJ's qualifications, and the IJ's alleged lies, falsifications, and misleading statements. And the BIA addressed the Ingods' arguments about their countries of designation. It is therefore clear that the BIA considered the issues raised by the Ingods and announced its decision in terms sufficient to enable our review.

### ii. Merits

We next address the merits of the Ingods' due process claims. "It is well settled that individuals in deportation proceedings are entitled to due process of law under the Fifth Amendment." *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1281 (11th Cir. 2007). "To establish due process violations in removal proceedings, aliens must show that they were deprived of liberty without due process of law, and that the asserted errors caused them substantial prejudice." *Lonyem*, 352 F.3d at 1341–42. To show substantial prejudice, "an alien must demonstrate that, in the absence of the alleged violations, the outcome of the proceeding would have been different." *Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1143 (11th Cir. 2010) (per curiam). "However, 'the failure to receive relief that is purely discretionary in nature does not amount to a deprivation of a liberty interest.'" *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1275 (11th Cir.

2009) (quoting *Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1253 (11th Cir. 2008)).

Although 8 U.S.C. "§ 1253(a) gives the alien the power to initially designate the deportation country, when that designation or the alien refuses to specify such a country, the provision reposes very broad discretion in the [BIA] to designate the removal country." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1295 (11th Cir. 2001), *overruled on other grounds by Patel v. U.S. Att'y Gen.*, 971 F.3d 1258 (11th Cir. 2020). Under 8 U.S.C. § 1231(b)(2)(A)(i), "any alien . . . who has been ordered removed may designate one country to which the alien wants to be removed." "If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen." 8 U.S.C. § 1231(b)(2)(D). "If an alien is not removed to a country under [these] subparagraphs, the Attorney General shall remove the alien" to a specified list of countries, including "[t]he country in which the alien was born." *See id.* § 1231(b)(2)(E)(iv).

The regulations also provide that the IJ "shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing." 8 C.F.R. § 1240.1(c). And the regulations note that "[n]othing in this section is intended to limit the authority of the immigration judge to properly control the scope of any evidentiary hearing." *Id.* § 1240.11(c)(3)(ii).

We see no due process violations here. First, the Ingods' contention that they were not given proper notice of potential

countries of removal is unpersuasive. The Ingods declined to designate countries of removal when asked. By declining, the Ingods ceded broad discretionary authority to the IJ and BIA to designate their countries of removal. *See Al Najjar*, 257 F.3d at 1295. The BIA was thus required to remove the Ingods to countries where they were subjects, nationals, or citizens. *See* 8 U.S.C. § 1231(b)(2)(D). Though the Ingods argue that neither Mr. Ingod nor Mrs. Ingod are citizens of Mongolia and India, respectively, the Ingods admitted that they were born in those countries. And the Ingods confirmed that they had no documentation showing that they were not citizens of those countries. Even if we accept the Ingods' assertions of their lack of citizenship, the BIA can still remove them to the countries in which they were born. *Id.* § 1231(b)(2)(E)(iv).

As to the Ingods' more general assertions of due process violations, the BIA also did not err in holding that the IJ did not violate the Ingods' due process rights.[8] The Ingods' contention that the IJ failed to appropriately explain the merits hearing process is contradicted by the record. The IJ informed the Ingods that she would ask questions, would then allow the government to ask questions, and would then allow the Ingods to raise anything else. Mr. Ingod confirmed that he understood this.

---

[8] Many of the other alleged errors that the Ingods recite are trivial. For example, the argument that the IJ used the word "presume" when questioning Mr. Ingod but wrote "assume" in her decision does not amount to a due process violation.

The Ingods' assertion that the IJ prevented Mr. Ingod from testifying in narrative form is also contradicted by the record. Prior to the merits hearing, the IJ accepted Mr. Ingod's written summary of the case, which contained more detailed information than his original application, and the IJ allowed Mr. Ingod to testify to the information within that statement. This was within the IJ's discretion to control the scope of the hearing. *See* 8 C.F.R. § 1240.11(c)(3)(ii). If the Ingods suggest they should have been allowed to give live, uninterrupted testimony, they cite no authority for that proposition. Moreover, the IJ offered Mr. Ingod two opportunities to add anything to the record, once at the close of the IJ's questioning and again after the Government's closing arguments.[9]

Finally, the Ingods' argument that the IJ was inappropriately influenced by her assumption that they had fraudulently changed their names fails. That the IJ questioned whether the Ingods legally changed their names does not show that the IJ thought they did so fraudulently. Moreover, as the BIA noted, this issue did not affect the IJ's burden-of-proof rulings.

The BIA thus did not err in holding that the IJ correctly designated the Ingods' countries of removal. Nor did the BIA err in holding that the IJ did not otherwise violate the Ingods' due process rights.

---

[9] We also note that the Ingods had approximately five years to prepare for their merits hearing.

### B. *Substantial Evidence*

Like their due process claims, the Ingods make several substantial evidence-based arguments. Interspersed among these arguments, they suggest that the BIA rejected their logical conclusions without an adequate explanation and that the BIA conducted de novo review on factual issues that the IJ did not decide. The Ingods contend that it is unclear whether the BIA implicitly rebutted the presumption of Mr. Ingod's credibility.[10] They also assert that the IJ made self-contradictory statements of material fact and that the BIA remained silent about this. The Ingods also argue that given the IJ's denial of Mr. Ingod's applications relied heavily on "the insufficiency of corroborating evidence," the BIA should have remanded the proceedings. Last, the Ingods argue that the BIA's rejection of their argument that the IJ made clearly erroneous factual findings is unfair because the IJ distorted Mr. Ingod's testimony.

### i. Reasoned Consideration

Again, the Ingods appear to argue that the BIA did not give reasoned consideration to their arguments. We disagree. The BIA reviewed the key points of Mr. Ingod's testimony and explained point-by-point why it upheld the IJ's decision. The BIA thus considered the issues raised in the Ingods' appeal and announced its

---

[10] The Ingods also add new facts about the production of Mr. Ingod's film. "[W]e cannot engage in fact-finding on appeal, nor may we weigh evidence that was not previously considered below." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1278 (11th Cir. 2001). We therefore do not consider these new facts.

decision in terms sufficient for this Court to "perceive that it has heard and thought and not merely reacted." *Jeune*, 810 F.3d at 803.

### ii. Merits

We now turn to the merits of the Ingods' substantial evidence arguments. As noted above, we review the BIA's factual findings for substantial evidence. *See Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019). "The asylum applicant bears the burden of proving refugee status." *Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010) (per curiam). To meet this burden, the applicant must, "with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a 'well-founded fear' that the statutorily listed factor will cause such future persecution." *Id.*; 8 C.F.R. § 1208.13(a)–(b). "A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1007 (11th Cir. 2008); 8 C.F.R. § 208.13(b)(1). Absent a showing of past persecution, an applicant can show a well-founded fear of future persecution "by demonstrating (1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected ground." *De Santamaria*, 525 F.3d at 1007; 8 C.F.R. § 208.13(b)(2).

An applicant is eligible for withholding of removal if he or she shows that, upon return to his country, he more likely than not will be persecuted there based on a protected ground. *See* 8 U.S.C. § 1231(b)(3)(A). If an applicant cannot meet the "well-founded fear" standard of asylum, he generally will not be eligible

for withholding of removal. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1352 (11th Cir. 2009).

To be eligible for CAT relief, an applicant must "establish that it is more likely than not he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004).

Under the REAL ID Act, the applicant bears the burden of proof of the basic facts of his or her claim. 8 U.S.C. §§ 1158(b)(1)(B)(i), 1231(b)(3)(C). "The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Id.* § 1158(b)(1)(B)(ii). But "[w]here the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." *Id.*

Substantial evidence supports the BIA's affirmance of the IJ's determination that Mr. Ingod's testimony was neither persuasive nor sufficient to carry his burden of proof for three reasons. First, the Ingods' contention that it is unclear whether the BIA implicitly rebutted Mr. Ingod's presumption of credibility is irrelevant. The BIA determined that the IJ did not make an adverse credibility

finding.[11]  As the BIA explained, the thrust of the IJ's analysis focused on the insufficiency of Mr. Ingod's evidence, rather than on credibility issues.  And, as the IJ properly noted, applicants "must establish testimony that is not only credible, but also persuasive and specific enough to establish the facts of the case."  "[T]he INA expressly distinguishes between credibility, persuasiveness, and the burden of proof." *Garland v. Ming Dai*, 141 S. Ct. 1669, 1680 (2021).  For an applicant's "testimony to carry the day on its own" the INA requires that the applicant "satisfy the trier of fact on all three counts." *Id.*  Even if the BIA treats the applicant's testimony as credible, it "need not find his [testimony] persuasive or sufficient to meet the burden of proof." *Id.*

Second, the BIA's finding that Mr. Ingod's testimony was ultimately unpersuasive is supported by the record.  Mr. Ingod's testimony was often inconsistent with the information he provided in his initial application or elsewhere in his testimony.  Consider three examples: (1) his alleged poisoning in Fiji, (2) details about the film,

---

[11] To the extent that the Ingods argue that the BIA incorrectly found that the IJ did not make a credibility determination, they are mistaken.  True, the IJ found portions of Mr. Ingod's testimony neither "persuasive nor credible."  But, as we have found in other cases, this is not a "clean determination[] of credibility." *See Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005) (holding that an IJ did not make an explicit credibility finding when the IJ referenced an applicant's claims as extremely inconsistent and making no sense).  "Thus, for purposes of our review, we will assume that any credibility determinations by the IJ were *not* dispositive of the appeal." *Id.*

and (3) his ability to travel freely while participating in activities the Chinese government exiled him for.[12]

Central to Mr. Ingod's alleged fear of persecution was his testimony that someone from China tried to poison him while he was in Fiji in 2012. Yet Mr. Ingod's 2013 application does not mention this. Mr. Ingod's explanation for why this was not mentioned—i.e., he did not believe the poisoning was an attack until after he filed his application—is perplexing considering his other testimony. Mr. Ingod testified that a blood test revealed that he had been poisoned two days after he fell ill. And when the IJ asked why he did not report the poisoning to the Fijian police, Mr. Ingod testified that he was worried the police would tell the Chinese embassy. So Mr. Ingod must have assumed that someone from China was behind the attack at the time even if he could not be certain.

Also critical to Mr. Ingod's fear of persecution was the film he was making about his sister and the Tiananmen Square Massacre. Mr. Ingod testified that he was solely responsible for making the film. Yet in his application, Mr. Ingod reported that his entire family was involved and that this led the Chinese government to "hate the voice of [his] family." Although Mr. Ingod attempted to clarify in his brief to the BIA that his father had only a nominal role

---

[12] Another notable inconsistency between Mr. Ingod's application and testimony was his translation work for the South Korean NGO, One Nation. Though Mr. Ingod insists that he mentioned this to the USCIS Asylum Officer in 2013, there is no proof of this. Even if true, it does not change the fact that Mr. Ingod did not include this information in his application.

in the film's production, this is still inconsistent with his testimony. It also fails to adequately explain why his father remained unharmed in China—as noted by the IJ—until he committed suicide.

Even setting aside those inconsistencies, the IJ and BIA permissibly found that Mr. Ingod's ability to travel freely and run multiple businesses was inconsistent with his testimony that his political actions subjected him to persecution by the Chinese government. Before the BIA, Mr. Ingod argued that his activities—like meeting with Zhao while he was under house arrest in 2004 and meeting with the Dalai Lama in 2006—were not "even close to China's 'political red line'" or seditious. Yet he also argued that these activities, among others, contributed to his exile. It was therefore reasonable for the BIA to conclude that the Chinese government viewed these activities as problematic. And considering Mr. Ingod's insistence that the Chinese government tried to murder him after he left China, such information would be relevant to his applications.[13] That is especially true because Mr. Ingod testified that he confirmed the charges against him before he filed his applications.

Finally, the BIA's finding that the IJ appropriately required Mr. Ingod to submit corroborating evidence to meet his burden of proof is supported by substantial evidence. "The weaker an applicant's testimony . . . the greater the need for corroborative evidence." *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005).

---

[13] The Ingods' argument that the IJ did not allow Mr. Ingod to explain this inconsistency contradicts the record.

And "[w]here the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii).

As explained above, the IJ determined that the Ingods' testimony—though not incredible—did not satisfy Mr. Ingod's burden of proof and that reasonably available corroborating evidence was required. Mr. Ingod provided no corroborating evidence about his claims, including: the film script, his sister's death, his contact with the Dalai Lama, any business records, the email from his father about his suicide plan, medical treatment records after he was poisoned, or any records from his work for One Nation. Notably, in 2017, the IJ informed Mr. Ingod that he had a duty to submit evidence to support his claims.

We are also unpersuaded by the Ingods' argument that they could not obtain supporting evidence because Mr. Ingod was exiled, faced death threats, and lived in seclusion. These explanations do not account for the Ingods' ability to get records from other countries outside of China, such as Mr. Ingod's medical records from Fiji or his One Nation records from South Korea. The BIA's finding that the IJ properly concluded such evidence was reasonably available is thus supported by substantial evidence.

We therefore have no reason to disturb the BIA's affirmance of the IJ's denial of the Ingods' applications. Mr. Ingod did not establish through testimony that he suffered past persecution on

account of a statutorily protected ground or that he had a well-founded fear of future prosecution. *See Diallo*, 596 F.3d at 1332. As Mr. Ingod failed to meet the "well-founded fear" standard for asylum relief, he necessarily cannot meet the higher more-likely-than-not standard for withholding of removal. *See Kazemzadeh*, 577 F.3d at 1352. Mr. Ingod also failed to show through sufficient testimony that he would be more likely than not tortured if he was removed to China. *See Reyes-Sanchez*, 369 F.3d at 1242. And he did not provide corroborating evidence to support his claims though such evidence was reasonably available. The BIA's affirmance of the IJ's denial of Mr. Ingod's applications is supported by substantial evidence.

## IV. Conclusion

Accordingly, we deny the Ingods' petition for asylum, withholding of removal, and CAT relief.

**PETITION DENIED.**